# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CPC MIKAWAYA HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0707-MTZ |
| | ) | |
| MYMO INTERMEDIATE, INC., and | ) | |
| MIKAWAYA HOLDINGS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
Date Submitted: March 15, 2022
Date Decided: June 29, 2022

Kevin R. Shannon, Christopher N. Kelly, and Emma K. Diver, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; John E. Schreiber and Aaron C. O'Dell, WINSTON & STRAWN LLP, Los Angeles, California, *Attorneys for Plaintiff CPC Mikawaya Holdings, LLC.*

A. Thompson Bayliss and April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Timothy R. Farrell, ROPES & GRAY LLP, Chicago, Illinois; Patrick S. Doherty, ROPES & GRAY LLP, London, United Kingdom; Sarah M. Milkovich, ROPES & GRAY LLP, Boston, Massachusetts, *Attorneys for Defendants MyMo Intermediate, Inc. and Mikawaya Holdings, Inc.*

**ZURN, Vice Chancellor.**

This matter stems from the January 2020 sale of an ice cream company to a private buyer. The parties' merger agreement included a comprehensive structure allocating tax benefits from the transaction between the buyer and the sellers, with much of the benefit going to the sellers. Where the buyer was required to complete the target's pre-closing tax returns, the merger agreement prioritized consistency with the sellers' preferences and past practices. It obligated the buyer to prepare the target's pre-closing tax returns using the "existing procedures and practices and accounting methods" the sellers used before the merger. It gave the sellers' representative an opportunity to comment on those tax returns before the buyer filed them. And it obligated the buyer to incorporate any reasonable comments the sellers' representative made.

Changes to the tax code in the wake of the global pandemic rocked the parties' bargain. The buyer sought to take advantage of new tax opportunities that were previously not part of the target's practice. The sellers' representative orally agreed to allow the buyer to take advantage of these opportunities, using novel tax practices, if the buyer promised to remit the resulting refunds to the sellers. The buyer agreed, and the returns were completed using the new practices. But when the refunds arrived, the buyer largely kept them for itself, arguing the merger agreement required nothing different.

The sellers' representative sued under contract, quasi-contract, and fraud to recover portions of the target's tax refunds. On the buyer's motion to dismiss, I conclude the sellers' representative states viable claims for breach of the merger agreement, breach of the parties' alleged oral agreement, and an unjust enrichment claim in the alternative. But the sellers' representative's other quasi-contract claims are foreclosed by the comprehensive language in the merger agreement. And the sellers' representative fails to plead an actionable false statement for the purposes of its fraud claim. And so, for the reasons I will explain, the buyer's motion is granted in part and denied in part.

## I.    BACKGROUND[1]

The Verified Amended Complaint (the "Amended Complaint") in this action alleges contract, quasi-contract, and fraud claims arising from the January 29, 2020 merger (the "Merger") between Defendant Mikawaya Holdings, Inc. (the

---

[1] I draw the following facts from the Amended Verified Complaint, available at Docket Item ("D.I.") 13 [hereinafter "Am. Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Kirby Decl. Ex. —" refer to the exhibits attached to the Declaration of April M. Kirby in Support of Defendants' Motion to Dismiss the Amended Verified Complaint, available at D.I. 17. Citations in the form of "OB —" refer to the Opening Brief in Support of Defendants' Motion to Dismiss the Amended Verified Complaint, also available at D.I. 17. Citations in the form "AB —" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss the Amended Verified Complaint, available at D.I. 19. And citations in the form "RB —" refer to the Reply Brief in Further Support of Defendants' Motion to Dismiss the Amended Verified Complaint, available at D.I. 22.

"Company") and a subsidiary of Defendant MyMo Intermediate, Inc. ("Buyer," and together with the Company, "Defendants"). The Company's wholly owned subsidiary, The Mochi Ice Cream Company, is the creator of mochi ice cream and operates the My/Mo Mochi Ice Cream brand. Buyer is an affiliate of Lakeview Capital, Inc. ("Lakeview"), a Michigan-based family office. Plaintiff CPC Mikawaya Holdings, LLC ("Plaintiff") is an affiliate of Century Park Capital Partners, LLC ("Century Park"), a California-based private equity firm. It is also the appointed post-Merger representative of the Company's former stockholders and optionholders (the "Sellers").

### A. The Parties Finalize The Merger And The Merger Agreement.

On December 14, 2019, the parties finalized the Merger, wherein Lakeview, through Buyer, would ultimately acquire the Company from Century Park at a $185 million enterprise value. The parties memorialized the Merger in an agreement and plan of merger (the "Merger Agreement").[2] The Merger closed on January 29, 2020, with the Company as the surviving entity.

Several provisions of the Merger Agreement detailing the treatment of taxes are notable to the parties' dispute. I summarize them briefly for context and quote the full provision as relevant in my analysis. Section 8.08 required Plaintiff, as the

---

[2] *See generally* Am. Compl. Ex. A [hereinafter "Merger Agr."].

3

stockholders' representative, to prepare and file the Company's tax returns that were due before closing, known as the "Stockholder Prepared Returns."[3] After closing, Buyer was obligated to prepare the Company's other tax returns, known as "Buyer Prepared Returns."[4] Where the Buyer Prepared Returns touched on pre-closing tax periods, Section 8.08(a)(ii) obligated Buyer to prepare them "on a basis consistent with existing procedures and practices and accounting methods."[5] That section also obligated Buyer to provide those returns to Plaintiff, as the stockholders' representative, for review and comment thirty days before filing.[6] Buyer was obligated to incorporate Plaintiff's reasonable comments.[7]

The Merger Agreement also addressed how to allocate tax benefits from the Merger. Section 8.08(i) requires the Buyer to pay to Sellers, through Plaintiff, certain deductions attributable to the Merger, defined as "Transaction Tax Benefits."[8] Section 8.08(j) also requires Buyer to pay to Plaintiff any tax refunds attributable to the Company's overpayment of income taxes for the tax period ending

---

[3] *See id.* § 8.08(a)(i).

[4] *See id.* § 8.08(a)(ii).

[5] *See id.*

[6] *See id.*

[7] *See id.*

[8] *See id.* § 8.08(i).

on June 30, 2019 (the "2019 Tax Period") or the final 2020 pre-closing stub period (the "2020 Stub Period").[9]

The Merger Agreement also contained an indemnification provision[10] and a prohibition on oral amendments.[11]

### B. After Closing, Federal Tax Law Changes, Creating New Tax Assets For The Company.

The COVID-19 pandemic began shortly after closing, prompting changes in the applicable tax law. On March 27, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, known as the "CARES Act." The CARES Act modified the internal revenue code's treatment of net operating losses ("NOLs"). Before the CARES Act, NOLs generally could only be "carried forward," meaning NOLs in one year could only be applied to reduce tax liability in future years. The CARES Act changed this system, permitting companies to carry NOLs accrued in the three most recent tax years back to the five tax years preceding the loss.[12] This offered liquidity to companies struggling in the pandemic, as they could retroactively reduce their tax liability and obtain immediate refunds.

---

[9] *See id.* § 8.08(j).

[10] *See id.* § 11.03(a).

[11] *See id.* § 12.11.

[12] *See* Am. Compl. ¶ 33 (citing 26 U.S.C. § 172).

The CARES Act also modified the treatment of previously paid alternative minimum tax ("AMT"). AMT sets a floor on the percentage of taxes a filer must pay, regardless of available deductions or tax credits. Before the 2017 Tax Cuts and Jobs Act ("TCJA"), corporations were subject to a twenty percent AMT. The TCJA repealed the corporate AMT for tax years beginning after December 31, 2017.[13] Previously paid AMT was treated as a future credit that could be carried forward indefinitely.[14] And fifty percent of the excess AMT over the allowable credit was refundable.[15] The CARES Act changed this system and made one hundred percent of AMT credits refundable for tax years beginning in 2018 or 2019.[16] As Plaintiff explains, the CARES Act's NOL and AMT rules interact. If the corporation uses an NOL carryback to reduce its tax liability in a previous year, it may increase its AMT liability, thus preventing the corporation from receiving the immediate cash flow the CARES Act sought to provide. Making AMT credits fully refundable avoids that result.

---

[13] *See id.* ¶ 34 (citing 26 U.S.C. § 55(a)).

[14] *See id.* (citing 26 U.S.C. § 53(d)(2)).

[15] *See id.* (citing 26 U.S.C. § 53(e)).

[16] *See id.* (citing 26 U.S.C. § 53(e)).

### C. Plaintiff And Buyer Discuss How To Allocate The Company's Tax Refunds.

After the CARES Act passed, representatives from the Plaintiff and the Company discussed how to apply the new rule permitting NOL carrybacks under the Merger Agreement. This was a significant question: Sellers incurred $16.5 million in Merger-related expenses, approximately $13.6 million of which were tax-deductible as NOLs. On April 3, Craig Berger, the Company's CEO, spoke with Martin Sarafa, the head of Plaintiff's affiliate Century Park. Though he was initially unaware of the CARES Act's NOL provision, Berger indicated that Lakeview and Buyer would likely agree to an arrangement wherein if Plaintiff agreed to let the Company carry back the transaction deductions as NOLs and refrain from using its comment rights under the Merger Agreement to force the Company to carry the transaction deductions forward, Buyer would pay Plaintiff the refunds derived from those NOL carrybacks (the "NOL Carryback Arrangement"). Sarafa and Berger exchanged emails to that effect. On April 22, Berger emailed Sarafa:

> I spoke to Plante Moran [Defendants' accountants] and they are planning on filing our stub return (7/1-1/29) around the same time that they file the stub 2 return (1/30-6/30). They are currently looking into how best to file for the loss carryback (there are a few different ways that it can be handled…amend prior returns or file a specific tax form). They also agree that the benefit goes back to the seller and think it would be best to handle it this way as the transaction benefit can be specifically identified and given back to seller.[17]

---

[17] *Id.* ¶ 38 (brackets and ellipse in original) (emphasis removed).

Plaintiff alleges subsequent emails "made clear Defendants' recognition that they were not entitled" to keep tax refunds derived from NOL carrybacks.[18] On May 15, Berger confirmed Lakeview's agreement to the NOL Carryback Arrangement to Sarafa. The Company also confirmed its agreement.

### D. Buyer Prepares And Files The Company's Tax Returns And Pays Plaintiff $357,393.

Buyer then prepared the Company's tax returns for several tax periods, including the 2019 Tax Period and the 2020 Stub Period. Buyer also completed an IRS Form 1139 (Corporation Application for Tentative Refund) for the taxable periods ending June 30, 2015; June 30, 2017; and June 30, 2018 (the "Forms 1139"), carrying back the transaction NOLs to those years to generate refunds under the CARES Act.[19] These were part of the "Buyer Prepared Returns" contemplated in the Merger Agreement.[20]

As required by the Merger Agreement, Buyer sent the Buyer Prepared Returns to Plaintiff on August 17 for its review and comment. Buyer's counsel indicated the stockholders' payment under Section 8.08(j) would be $357,393. Plaintiff replied by inquiring about the NOL carryback claims; the Company, apparently through

---

[18] *Id.* ¶ 40.

[19]*See* Am. Compl. Ex. B; *see also* Am. Compl. Ex. F. Buyer also submitted a Form 1139 for the 2019 tax year, but the dispute over that refund is encapsulated in the dispute over the 2019 Tax Period.

[20] *See* Merger Agr. § 8.08(a)(ii).

Berger, confirmed these refunds were for the former stockholders and thus would be paid to Plaintiff.[21] Based on these representations and the parties' alleged agreement to pay the tax refunds to Plaintiff, Plaintiff did not object and signed off on the Buyer Prepared Returns. Plaintiff alleges that without the assurances and agreement it received from Defendants, it would have objected to the Buyer Prepared Returns and would have submitted comments that the NOLs should be carried forward, not back.

Defendants ultimately paid Plaintiff only the $357,393 they originally proposed.[22] The parties thereafter sparred about Plaintiff's entitlement to refunds derived from the NOL carrybacks. On April 30, 2021, Plaintiff's counsel wrote to Defendants' counsel, claiming "the Company's position that refunds for [NOL] carryback claims are not for the account of Sellers . . . is contrary to both the terms of the Merger Agreement and the Company's own prior representations to Sellers."[23] Defendants' counsel responded on May 7, denying that Berger ever made such an agreement and pressing that, even if he did, it would not have been legally effective

---

[21] Plaintiff does not specifically allege what was said or who said it; Plaintiff alleges only that "In connection with the Plaintiff's review and consideration of the Buyer Prepared Returns . . . the Company again confirmed that the refunds for these items were for the account of the Stockholders and Optionholders," and that "Berger as Company CEO had full authority to make these arrangements." Am. Compl. ¶¶ 48–49.

[22] Am. Compl. ¶¶ 46 & n.6, 54. Buyer's payments to Plaintiff total $428,597, which include an additional $71,204 in "other, unrelated tax benefits owed under the Merger Agreement." *Id.* ¶ 45 n.5. Those payments are not subject to the parties' dispute here.

[23] *Id.* ¶ 55.

9

because the Merger Agreement prohibits oral waivers.[24]  Despite another letter from Plaintiff's counsel on May 27,[25] Buyer did not relent.

### E.    Plaintiff Initiates This Litigation.

Plaintiff filed its initial complaint in this action on August 17.[26]  Defendants moved to dismiss the initial complaint on October 1.[27]  Plaintiff responded by filing the Amended Complaint on November 9.[28]  Plaintiff seeks tax refunds from the 2019 Tax Period under the Merger Agreement, and the refunds from the Forms 1139 under the subsequent discussions about the CARES Act.  From the 2019 Tax Period, Plaintiff seeks the Company's entire refund for that year, minus what Buyer has already remitted.

The Company's tax liability for the 2019 Tax Period was $933,995.  After applying an NOL carryback to reduce its tax liability, the Company paid the rest of its liability using AMT credit.  Then, the Company contributed $2,029,166 over and above its liability from two sources:  (1) it was "deemed" to have paid its remaining $737,778 of AMT credit (the "AMT Surplus"), and (2) it actually paid $1,291,388

---

[24] *Id.* ¶ 56; Am. Compl. Ex. D at 1.

[25] Am. Compl. Ex. E.

[26] D.I. 1.

[27] D.I. 8.

[28] *See generally* Am. Compl.

10

in cash.[29]  The Company claimed that total, $2,029,166, as a refund on its Form 1139 for 2019.[30]  Buyer remitted $357,393 of that amount to Plaintiff,[31] leaving a disputed refund amount of $1,671,733.  Plaintiff contends it is entitled to the entire refund under Section 8.08(j), because both the AMT Surplus and cash are overpayments in the 2019 Tax Period.

Buyer also carried back NOLs attributable to transaction expenses to the taxable periods ending June 30, 2015; June 30, 2017; and June 30, 2018, and obtained refunds from those years via the Forms 1139.  These refunds total $887,125 (the "Forms 1139 Refunds").[32]  Plaintiff contends it is entitled to these refunds because Buyer said it was.

The Amended Complaint contains seven counts.  Counts I and III assert breach of contract theories under the Merger Agreement.  Specifically, Count I asserts a claim that Buyer breached Section 8.08(j) by failing to remit the full 2019 Tax Period refund to Plaintiff.  And Count III asserts a breach of Section 8.08(a)(ii) by using the novel NOL carryback practice, inconsistent with the

---

[29] *Id.* ¶ 46 & n.6.

[30] The Amended Complaint does not specify or adequately explain how the Company's AMT credit came to be.  *See id.*; *see also id.* ¶ 34.  Defendants argue it arises from earlier AMT payments, an issue I do not reach as it is outside the pleadings.

[31] This remittance ($357,393) is equal to the excess of the Company's cash payment ($1,291,388) over the Company's tax liability ($933,995).

[32] *See* Am. Compl. Ex. B (describing a $46,944 refund for 2018, a $188,377 refund for 2017, and a $651,804 refund for 2015).

11

Company's existing procedures and practices and accounting methods. Counts II and IV assert breaches of the implied covenant of good faith and fair dealing. Count V asserts a claim for fraud based on Buyer's representation that it would pay Plaintiff the refunds from the NOL carrybacks. Count VI asserts a claim for unjust enrichment. And Count VII asserts a claim for indemnification under the Merger Agreement. Defendants moved to dismiss the Amended Complaint on December 9 (the "Motion").[33] The parties briefed the Motion and the Court heard oral argument on March 15, 2022.[34]

## II. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[35]

---

[33] D.I. 17.

[34] D.I. 31; D.I. 32 [hereinafter "Hr'g Tr."].

[35] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

12

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[36] This standard is "minimal"[37] and "plaintiff-friendly."[38] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[39]

### A. Count I States A Claim For Breach Of Section 8.08(j).

As crystalized in briefing and at oral argument, Count I alleges that Buyer breached Section 8.08(j) by failing to remit to Plaintiff the rest of the Company's refunds for the 2019 Tax Period, totaling $1,671,773.[40] In the Motion, Defendants argue Count I fails to state a claim for two primary reasons. First, Defendants argue that by accepting the $357,393 payment in August 2020, Plaintiff waived any

---

[36] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[37] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[38] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

[39] *Cent. Mortg.*, 27 A.3d at 536.

[40] Plaintiff originally pled Count I as relating to its entire $2,558,898 claim, including the Forms 1139 Refunds. *See* Am. Compl. ¶¶ 65–67 (alleging Defendants, received but did not remit to Plaintiff, the "Tax Refunds" and casting this failure as a breach of Section 8.08(j)); *id.* ¶ 1 (defining "Tax Refunds" as "approximately $2.6 million"). In briefing, Plaintiff clarified that the Forms 1139 Refunds are not the subject of Count I. *See* AB 16 n.9 ("Plaintiff's breach of contract claim against Defendants in Count I is with respect to the $933,995 and $737,778 tax refunds that Defendants have refused to pay Plaintiff in breach of Section 8.08(j). Count I does not relate to the other $887,125 tax refunds from the NOL carrybacks to the 2015-2018 tax periods.").

entitlement to the remaining 2019 refunds.[41]  Second, Defendant argues Plaintiff is not entitled to the AMT Surplus because that money does not fit into Section 8.08(j)'s defined categories of "overpayments."[42]  Both arguments are fact-intensive and ill-suited for a motion to dismiss.  So at this early stage, I cannot follow Defendants down these paths.

### 1. Defendants' Waiver Argument Is Premature.

Defendants seek to dismiss the entirety of Count I on an admittedly fact-intensive argument:  waiver.  They argue that by accepting $357,393 in August 2020, Plaintiff waived any entitlement to any other money.  I cannot grant the Motion on this basis.

"Waiver is the voluntary and intentional relinquishment of a known right.  It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those rights."[43]  "[T]he facts relied upon to prove waiver must be unequivocal," and the party claiming waiver must show three elements:  "(1) that there is a requirement or condition to be waived, (2) that the waiving party must know of the requirement or condition, and (3) that the waiving

---

[41] *See* OB 23–26; RB 7–11; *see also* Hr'g Tr. 89.

[42] *See* OB 17–23; RB 4–7.

[43] *Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) (footnotes, alterations, and internal quotation marks omitted) (quoting *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005)).

party must intend to waive that requirement or condition."[44] This standard has been described as "quite exacting."[45] At the pleading stage, it is even harder to establish: the Court may only dismiss the claim if the plaintiff pleads facts that "incontrovertibly constitute" a waiver.[46] Because of waiver's fact-intensive nature, Delaware courts have been reluctant to evaluate it at the pleading stage.[47]

The Motion does not clear this high bar. Defendants' argument is premised entirely on a single email, where Sarafa, Century Park's CEO, responded to Buyer's counsel that "based on your responses to our questions on the state and federal returns below, we are signed off."[48] As a threshold matter, this email is not an exhibit to the Amended Complaint, and Defendants' argument for incorporating it by

---

[44] *Id.* at 50–51 (internal quotation marks omitted) (quoting *AeroGlobal*, 871 A.2d at 444).

[45] *Id.* at 50 (internal quotation marks omitted) (quoting *AeroGlobal*, 871 A.2d at 444).

[46] *E.g.*, *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 397 (Del. Ch. 2011) (internal quotation marks omitted) (quoting *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *3 (Del. Ch. Feb. 22, 2006)); *see also Caravias v. Interpath Commc'ns, Inc.*, 2008 WL 2268355, at *4 (Del. Ch. May 28, 2008); *Capano v. Capano*, 2003 WL 22843906, at *2 (Del. Ch. Nov. 14, 2003).

[47] *See, e.g.*, *Mergenthaler v. Hollingsworth Oil Co. Inc.*, 1995 WL 108883, at *2 (Del. Super. Feb. 22, 1995) ("Waiver implies knowledge and an intent to waive, and the facts relied on to prove waiver must be unequivocal. The question of waiver is normally a jury question, unless the facts are undisputed and give rise to only one reasonable inference." (citations omitted) (citing *Delmar News, Inc. v. Jacobs Oil Co.*, 584 A.2d 531, 535 (Del. Super. 1990), and *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975), and *G.M.S. Realty Corp. v. Girard Fire & Marine Ins. Co.*, 89 A.2d 857, 860 (Del. Super. 1952))).

[48] *See* Kirby Decl. Ex. B at 1.

reference is weak.[49]  More to the point, the Amended Complaint paints a different picture.  It alleges this email is part of a broader conversation in which Buyer, through Berger, agreed that Plaintiff would receive the full $2.6 million in refunds, including refunds attributable to the NOL carryback and all the 2019 refunds.[50]  These facts call into question whether Plaintiff intended to waive its right to other tax refund payments under Section 8.08(j).  Even considering Defendants' proffered exhibit, the facts fall well short of "incontrovertibly constitut[ing]"[51] a waiver and so, it would be inappropriate to dismiss Count I on those grounds.

### 2. Defendants' Attempt To Recharacterize The AMT Surplus Presents A Fact Question.

In addition to its waiver argument, Defendants attack Plaintiff's claimed entitlement to the AMT Surplus, arguing it fails to state a claim under Section 8.08(j).  Rather than disputing the meaning of Section 8.08(j), the parties clash over how to characterize the AMT Surplus and whether it constitutes an

---

[49] *See* OB 9 n.8 (citing Am. Compl. ¶¶ 58, 91, 113).  Though the paragraphs Defendants cite generally discuss the parties' back-and-forth surrounding tax returns, none of them quote, cite, or even reference the email exchange Defendants attached.  *See* Am. Compl. ¶¶ 58, 91, 113.  Indeed, paragraph 58 is mostly a block quote of a different exchange between the parties.  *See id.* ¶ 58 (quoting a May 27, 2021 letter from Plaintiff's counsel to Defendants' counsel).  The closest is paragraph 43, which references Defendants' counsel's August 17, 2020 message, the first in the Exhibit B chain.  *See id.* ¶ 43.  But none of the other messages are referenced in the Amended Complaint; and the August 17 message is not the message Defendants cite as evidence of waiver.

[50] *See, e.g.*, Am Compl. ¶ 48; *see also id.* ¶¶ 43–44, 49–52, 54.

[51] *Seven Invs.*, 32 A.3d at 397 (quoting *Canadian Com. Workers*, 2006 WL 456786, at *3).

"overpayment" in the 2019 Tax Period (or 2020 Stub Period). At this early stage, I must accept Plaintiff's factual characterization of the AMT Surplus, so I deny the Motion on that basis.

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[52] In determining the scope of the parties' obligations under the Merger Agreement, I apply Delaware's well-understood objective theory of contract interpretation. "To determine what contractual parties intended, Delaware courts start with the text."[53] In doing so, the Court aims to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[54] "Delaware adheres to the objective theory of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[55] The Court will "give effect to the plain-meaning of the contract's

---

[52] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[53] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[54] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[55] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

terms and provisions," "will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[56] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[57]

Section 8.08(j) requires the Buyer to remit to Plaintiff any of the Company's income tax refunds (or credits in lieu thereof) which are "attributable to overpayments of Income Tax" for the 2019 Tax Period.

> Tax Refunds. Following Closing, any cash Income Tax refunds (or credits in lieu thereof) attributable to overpayments of Income Taxes by the Target Companies for (i) the taxable period ending June 30, 2019, or (ii) the final Pre-Closing Tax Period (but only to the extent such Taxes were paid prior to the Closing (including by crediting overpayments of Tax from a prior tax year)) attributable to Transaction Deductions (determined on a "with or without" basis), that are received by the Buyer, the Target Companies, or any of their Affiliates will be for the account of the Stockholders and the Optionholders. Buyer shall pay or cause to be paid within thirty (30) days of actual receipt (by Buyer, the Target Companies, or any of their Affiliates) of such refund(s) in cash the amount of such refund(s) to the Stockholders' Representative for distribution to the Stockholders and the Optionholders. The amount of any payment under this Section 8.08(j) shall be calculated net of any reasonable costs, including Taxes, incurred by the Buyer, the Target Companies or any of their Affiliates of obtaining, distributing, or paying over any refund.[58]

---

[56] *Id.* at 1159–60 (internal quotation marks omitted) (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[57] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[58] Merger Agr. § 8.08(j). The "final Pre-Closing Tax Period" is the 2020 Stub Period. Section 8.08(j) also invokes the phrase "attributable to Transaction Deductions." *Id.* It is

18

As defined, "Income Tax" is "any Tax that is based on, or computed with respect to, income or earnings (and any franchise Tax or Tax on doing business imposed in lieu thereof), including any interest, penalty or addition thereto."[59] The phrase "overpayments of Income Tax" plainly includes a standard refund where the Company paid more income tax than it truly owed. But nothing in this language confines "overpayments" to true overpayments, to the exclusion of constructive "overpayments" labeled as such by tax authorities.[60]

Plaintiff argues the IRS treats the AMT Surplus as a 2019 overpayment, so it falls within Section 8.08(j)'s definition—even though on a practical level, it is the application of credits made available by a change in the law, not a true overpayment. Under Plaintiff's characterization, the IRS deemed the Company to have paid $1,214,165 in AMT, a form of "Income Tax," in the 2019 Tax Period, only $476,387

---

not immediately clear to me whether that phrase is intended to modify only the Stub Period in romanette (ii) or if it also limits refunds from the 2019 Tax Period. I do not wade into this issue because the parties do not present argument on it and apparently agree that the refunds at issue here are all attributable to "Transaction Deductions," as defined. *See* Hr'g Tr. 28–29, 51.

[59] Merger Agr. at 9 (defining "Income Tax").

[60] *See id.* § 8.08(j). I am reminded of the classic board game, Monopoly, in which one of the game's "Community Chest" card reads "Bank Error in Your Favor," and directs the drawer to collect $200. Of course, the Monopoly "bank" never made a real "error"; the card was designed to infuse cash into the game's small economy. If the drawer had contracted to remit to another player all "bank errors," nothing in that language would exclude a payment that the bank identified as a "bank error," even if that label was a bank-created fiction.

19

of which was necessary to cover its tax liabilities.[61] Thus, the Company "overpaid" by $737,778: the excess of the AMT credit it was deemed to have paid over and above the portion applied to its tax liabilities.[62] Indeed, some of the tax return documents describe this money as an "overpayment."[63] Plaintiff's characterization is reasonably conceivable.

Defendants argue that the AMT Surplus does not fall under Section 8.08(j) because it is not a 2019 overpayment. They assert that the AMT credit underlying the AMT Surplus must derive from AMT payments made before the 2019 Tax Period, and so cannot be a 2019 overpayment. They also argue the AMT Surplus is properly viewed as a tax credit, not as an "overpayment," because it does not represent a refund of money the Company actually paid.

This dispute does not present purely legal questions, such as the meaning of the word "overpayment" in Section 8.08(j). Rather, Defendants take aim at the nature of the AMT Surplus, arguing it cannot factually be what Plaintiff claims it is.

---

[61] *See* Am. Compl. ¶ 46 & n.6.

[62] *See id.*

[63] *See* Am. Compl. Ex. F at 8 (depicting a Form 1120 that lists the entire claimed amount, $2,029,166 as an "overpayment" that the Company seeks to have "refunded" and "credited to 2019 estimated tax"); *id.* at 1 (depicting a Form 1139 that lists $737,778 as "overpayment of tax due to a claim of right adjustment under section 1341(b)(1)"). Exhibit F is not paginated.

The Court cannot resolve factual disputes on a motion to dismiss.[64] When such a motion turns on the Court's characterization of a disputed fact and its application to a contract, the plaintiff's burden is to plead sufficient facts to support its characterization.[65] Plaintiff has done so here. While I cannot resolve the dispute over whether the AMT Surplus was truly a qualifying overpayment on the record before me, Plaintiff's characterization of it as an IRS-deemed 2019 overpayment is

---

[64] *See, e.g.*, *Highland Pipeline Leasing, LLC v. Magellan Pipeline Co., L.P.*, 2021 WL 1292794, at *3 (Del. Super. Apr. 6, 2021) ("The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to resolve dispute[d] issue[s] of material facts or decide the merits of the case." (citing *Belfint, Lyons, & Shuman v. Potts Welding & Boiler Repair, Co., Inc.*, 2006 WL 2788188, at *2 (Del. Super. Aug. 28, 2006)); *Cantor Fitzgerald, L.P. v. Chandler*, 1998 WL 44981, at *1 (Del. Ch. Jan. 27, 1998) ("As the parties dispute many of the facts material to the issue of whether Defendants' consent to suit should be disregarded and the action dismissed for lack of personal jurisdiction or on the grounds of forum *non conveniens*, it would be inappropriate for me to grant Defendants' motion to dismiss. On these bases, the motion is denied."); *Henry v. Middletown Farmers Mkt., LLC*, 2014 WL 4426311, at *2 (Del. Super. Sept. 8, 2014) (denying motion to dismiss in the face of a factual dispute).

[65] *See Hudson v. Bank of Am., N.A.*, 2014 WL 4693242, at *7 (Del. Super. Sept. 16, 2014) ("Only when under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief may be granted should a Court dismiss the complaint. The parties may indeed be in disagreement as to whether the Tender Letter constituted tender, but Plaintiff has pled facts sufficient to sustain the claims in the Complaint." (footnote and internal quotation marks omitted) (quoting *Boyce Thompson Inst. v. MedImmune, Inc.*, 2009 WL 1482237, at *4 (Del. Super. May 19, 2009))). In *Hudson*, the Superior Court similarly considered a motion to dismiss based on the defendant's alternative characterization of the relevant facts. There, the parties disagreed about whether plaintiff's purported "Tender Letter" was a sufficient tender of his remaining loan payments under both the parties' mortgage agreement and relevant statutory law. *Id.* at *4–7. The defendant bank moved to dismiss the plaintiff's claims by characterizing the Tender Letter as a mere offer to pay, not a tender of payment. *Id.* at *6–7. The Court rejected the motion, finding the plaintiff had pled sufficient facts to support his characterization of the letter as a tender of the necessary payment. *Id.* at *7.

sufficient at this stage.  In other words, Plaintiff's breach theory is reasonably conceivable.[66]  Additional discovery, perhaps including expert testimony, will be necessary to determine if Plaintiff will succeed on the merits.

The Motion is denied with respect to Count I.

### B.      Count III States A Claim For Breach Of Section 8.08(a)(ii).

Count III alleges Buyer breached Section 8.08(a)(ii) when it carried the NOLs back instead of forward, both in the 2019 Tax Period and in the Forms 1139.  It also includes an "alternative" claim alleging Buyer breached the oral NOL Carryback Arrangement, wherein the Plaintiff agreed to permit Buyer to carry the NOLs back if Buyer agreed to give the proceeds of those NOL carrybacks to Plaintiff.  I conclude the Amended Complaint sufficiently pleads both claims.

### 1.      Carrying The NOLs Back Breached Section 8.08(a)(ii).

Section 8.08(a)(ii) deals with the Buyer Prepared Returns.  The first two sentences require Buyer to prepare returns for pre-closing tax periods just as Sellers had before the Merger:

---

[66] Admittedly, this factual question has elements of tax law wrapped into it.  But I cannot resolve this question on the pleadings alone.  So, like the Superior Court in *Hudson*, I decline to reject Plaintiff's theory as inconceivable and permit it to move into discovery to support its characterization.  *See id.*

> Buyer, at its sole cost and expense, shall cause each Target Company to prepare and timely file all Tax Returns (other than Stockholder Prepared Returns) of such Target Company (the "<u>Buyer Prepared Returns</u>"). To the extent that a Buyer Prepared Return relates to a Pre-Closing Tax Period, such Tax Return shall be prepared ***on a basis consistent with existing procedures and practices and accounting methods***.[67]

The second two sentences describe a comment and revision procedure, wherein Buyer must provide drafts of the Buyer Prepared Returns to Plaintiff, Plaintiff may respond with comments on those drafts, and Buyer is obliged to incorporate Plaintiff's reasonable comments:

> At least thirty (30) days prior to the due date of any Buyer Prepared Return that relates to a Pre-Closing Tax Period, Buyer shall provide a draft of such Tax Return to the Stockholders' Representative for the Stockholders' Representative's review and comment. Buyer shall cause the applicable Target Company to incorporate any reasonable comments made by the Stockholders' Representative in the Tax Return actually filed.[68]

Plaintiff claims Buyer's decision to carry the NOLs back, rather than forward, breached Section 8.08(a)(ii)'s second sentence because it was inconsistent with the Company's "existing procedures and practices and accounting methods" at the time of the Merger Agreement. I agree.

---

[67] Merger Agr. § 8.08(a)(ii) (emphasis added) (underline in original).

[68] *Id.*

The plain meaning of the phrase "existing procedures and practices and accounting methods," as defined in common dictionaries, is broad.[69] A "procedure" is a particular way of accomplishing something, sometimes characterized by a series of steps or an established way of doing things.[70] A "practice" is the way a party regularly behaves, or the usual way of doing something.[71] An "accounting method" refers to the specific rules or system a company uses to determine and record its financial information, especially for tax purposes.[72] It is undisputed that before the Merger, the Company only carried its NOLs forward when it prepared its tax

---

[69] "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract," as "dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[70] *See Procedure*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/procedure (last visited June 29, 2022) ("1a: a particular way of accomplishing something or of acting . . . 2a: a series of steps followed in a regular definite order . . . 3a: a traditional or established way of doing things"); *see also Procedure*, *Black's Law Dictionary* (11th ed. 2019) ("1. A specific method or course of action.").

[71] *See Practice*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/practice (last visited June 29, 2022) ("a: actual performance or application . . . b: a repeated or customary action . . . c: the usual way of doing something"); *see also Practice*, *Black's Law Dictionary* (11th ed. 2019) ("3. An established custom or prescribed usage.").

[72] *See Accounting Method*, *Black's Law Dictionary* (11th ed. 2019) ("A system for determining income and expenses, profit and loss, asset value, appreciation and depreciation, and the like, esp. for tax purposes.").

returns.[73]  In other words, carrying NOLs forward, not back, was the Company's existing practice at the time of the Merger.  Plaintiff's allegation that Buyer chose to carry the NOLs back alleges the Buyer Prepared Returns were inconsistent with the Company's existing practices.  This states a claim for breach of Section 8.08(a)(ii).

This interpretation is consistent with other Delaware cases interpreting similar language in merger agreements.  Parties sometimes have reason to prioritize consistent application of accounting principles; when they do, that agreement on consistency will be respected.  In *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*,[74] for example, the merger agreement's "true up" process required both the buyer and the seller to calculate the target's net working capital "in accordance with United States generally accepted accounting principles ('GAAP') *applied on a consistent basis throughout the periods indicated and with the Agreed Principles*."[75]  The "Agreed Principles" further required that working capital "will be determined in a manner consistent with GAAP, consistently applied by [the target] in preparation of the financial statements of the Business, as in effect on the Closing Date," and that calculation "shall be based on the past practices and

---

[73] Indeed, this was the Company's only option.  The CARES Act, which allowed taxpayers to carry their NOLs back, passed in March 2020, after the Merger Agreement was signed in December 2019 and the Merger closed in January 2020.  *See* Am. Compl. ¶¶ 5, 17–18.

[74] 166 A.3d 912 (Del. 2017).

[75] *Id.* at 922.

accounting principles, methodologies and policies applied by [target] and its subsidiaries."[76] The parties used different accounting methods, to tremendously different results. The buyer asserted the target's historical financial statements "were not based on a proper application of [GAAP]" and contended the contract language allowed the buyer to prepare the calculations in a manner it viewed as GAAP compliant, even though that method was inconsistent with the target's past practices.[77] The *Chicago Bridge* Court rejected that argument and held that the contract language required consistent treatment, even in the face of tension with the buyer's view of GAAP.

> The phrases "applied on a consistent basis throughout the periods indicated" and "based on the past practices and accounting principles, methodologies and policies" both require consistent accounting treatment. They recognize that GAAP allows for a variety of treatments and different accountants may come to differing views on what constitutes acceptable GAAP treatment, but for the purpose of these calculations, both [the buyer] and [the seller] must hold the accounting approach constant. Thus, the True Up and the Agreed Principles work together to establish a requirement of consistency.[78]

Parties may instead prioritize something other than consistency, like a particular accounting principle. In *Golden Rule Financial Corporation v. Shareholder Representative Services LLC*,[79] the true up provision required the

---

[76] *Id.*

[77] *See id.* at 915.

[78] *Id.* at 929.

[79] 2021 WL 305741 (Del. Ch. Jan. 29, 2021), *aff'd*, 267 A.3d 382 (Del. 2021).

Buyer's post-closing financial statements be prepared "in accordance with the Accounting Principles, consistently applied."[80] The buyer in *Golden Rule Financial* argued that, consistent with *Chicago Bridge*, this language required a consistent approach to the company's accounting principles, even if that was not the technically correct approach.[81] But the Court found that the company's "Accounting Principles" compelled adherence to a particular identified accounting method.[82] The *Golden Rule Financial* Court concluded this specific reference compelled the buyer to prioritize applying that method correctly, rather than consistently, stressing that the parties "bargained for the application of a specific accounting principle."[83]

Section 8.08(a)(ii) more closely resembles the *Chicago Bridge* provision than the *Golden Rule Financial* provision. It does not reference GAAP, or any particular accounting method or set of rules. It only mentions the Company's past practices. By using this language, the parties prioritized historical consistency over flexibility or the correct application of a set of external rules. As in *Chicago Bridge*, prioritizing consistency "makes sense when considering the whole point of these

---

[80] *Id.* at *2.

[81] *Id.* at *5–6.

[82] *Id.* (noting the Accounting Principles specifically state "[t]he Closing Balance Sheet and Tangible Net Worth will reflect the impact of the requirements of [a particular accounting method]" and concluding the plain meaning of this language "requires [the accounting method] to be applied *correctly*").

[83] *Id.* at *9.

statements."[84]  Buyer is not bound to follow Sellers' lead for all time, but rather, only in preparing the Company's pre-closing tax returns for the period where Sellers owned the Company.  Because Section 8.08(j) largely gives Sellers the benefit of the refunds generated by those tax returns, it makes sense that Sellers' past practices ought to govern.  Section 8.08(a)(ii)'s opportunity for Sellers to comment and review reinforces the focus on Sellers' past practices, and underscores the primacy of the Sellers' preferences in preparing pre-closing tax returns.

Defendants argue Section 8.08(a)(ii) gives them more flexibility, and only requires them to comply with the existing tax law.  But reading the Company's "existing procedures and practices and accounting methods" to mean something less specific, such as "complying with the tax code" or "maximizing tax refunds," as Buyer suggests, would be to render the provision meaningless.  This Court in *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*[85] cautioned against such a broad interpretation of an "ordinary course" obligation.  There, the seller argued it behaved consistently with past its practice by "maximizing margins given existing demand."[86]  The *AB Stable* Court observed "[t]he breadth of this statement shows that it is no standard at all."[87]

---

[84] *See* 166 A.3d at 929.

[85] 2020 WL 7024929 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[86] *Id.* at *79 (alterations and internal quotation marks omitted).

[87] *Id.*

Defendants also argue this interpretation would require Buyer to "ignore changes in the tax code."[88] This is true insofar as the changes are optional and the past practice remains legal.[89] But this rigidity does not doom the interpretation requiring consistency with past practices. The parties chose to contract for that consistency, not the maximization of new opportunities or even a set of accounting rules that could leave room for varying results.[90] Sophisticated parties, represented

---

[88] OB 27.

[89] Section 8.08(a)(ii) would not compel Buyer to break the law. For example, suppose that instead of creating a carryback option, the CARES Act eliminated the option to carry NOLs forward and required they be carried back. In that circumstance, Plaintiff could not be heard to argue Section 8.08(a)(ii) would force Buyer to continue to carry NOLs back, as doing so would be a positive violation of the law. The Merger Agreement guards against this possibility in its recital of the Company's existing tax policies in Section 3.11(a), which represents the Company has always prepared its tax returns in compliance with the law. *See* Merger Agr. § 3.11(a). Because part of the Company's "existing procedures and practices and accounting methods" already incorporate compliance with applicable law, Buyer would not be compelled to break the law if the law changed to prohibit the Company's then-existing practices. Buyer would be compelled to follow the new law. No party has argued carrying the NOLs forward instead of back would amount to a positive violation of the law.

[90] *See Golden Rule Fin.*, 2021 WL 305741, at *5; *see also id.* at *6 ("Admittedly, this dispute involves accounting principles, which do not always lend themselves to black-and-white conclusions about correct application." (citing *Chicago Bridge*, 166 A.3d at 929, and *Alliant Techsystems, Inc. v. MidOcean Bushnell Hldgs., L.P.*, 2015 WL 1897659, at *8 (Del. Ch. Apr. 24, 2015))); *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (noting even generally accepted accounting principles do not prescribe a single "canonical set of rules" and instead "tolerate a range of reasonable treatments, leaving the choice among alternatives to management" (internal quotation marks omitted)).

by counsel, could have taken those or other paths.[91]  Our law respects and will enforce that choice.

### 2. The Motion Does Not Provide A Basis To Dismiss Plaintiff's NOL Carryback Arrangement Claim.

While Count III is titled "Breach of Merger Agreement § 8.08(a)(ii)," it also contains what Plaintiff describes as an "alternative" claim:  that Buyer and Plaintiff agreed to modify the Merger Agreement to reflect the NOL Carryback Arrangement and Buyer breached that arrangement.[92]  As Plaintiff tells it, Plaintiff and Buyer agreed that in exchange for Plaintiff refraining from commenting on the Buyer Prepared Returns and causing the NOLs to be carried forward instead of carried back, Buyer agreed the refunds from the NOL carrybacks would go to Plaintiff.[93]  Defendants argue this claim should be dismissed for two reasons.  First, Defendants assert the NOL Carryback Arrangement was not supported by consideration, so the parties could not form a contract.[94]  And second, Defendants argue the Merger

---

[91] For example, in *Edinburgh Holdings, Inc. v. Education Affiliates, Inc.*, the parties agreed the seller was obliged to "conduct its activities in a reasonable manner consistent with its past practices," but, "notwithstanding" that restriction, "will be afforded the ability to make and execute strategies and plans to grow their business with full cooperation from Buyer." 2018 WL 2727542, at *14 (Del. Ch. June 6, 2018) (alterations omitted).  The Court noted the "notwithstanding" language gave the Sellers flexibility to take action "even if not consistent with its past practices."  *Id.* (internal quotation marks omitted).

[92] *See* Am Compl. ¶¶ 93–95.

[93] *See id.* ¶ 93.

[94] *See* OB 29–30; RB 15.

Agreement's prohibition on oral modifications bars Plaintiff's claim.[95] In the interests of judicial economy, I consider Plaintiff's alternative claim and conclude it survives the Motion.

Defendants' primary argument, that the NOL Carryback Arrangement lacks consideration, falls readily. "It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration. Consideration is a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request."[96] Defendants' consideration argument relies on their contractual argument that Section 8.08(a)(ii) does not require Buyer to carry the NOLs forward. In that universe, Defendants contend, Plaintiff's agreement to allow Buyer to carry the NOLs back and surrender its right to comment on the Buyer Prepared Returns was not consideration, because Buyer could have carried the NOLs back anyway.[97] For the reasons explained above, I disagree with Defendants' reading of

---

[95] *See* OB 30–32; RB 14.

[96] *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1088 (Del. Ch. 2014) (alterations and internal quotation marks omitted) (quoting *James J. Gory Mech. Contracting, Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011)); *see Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000).

[97] *See* OB 29–30.

Section 8.08(a)(ii). Plaintiff's promise to forgo its contractual rights, a detriment to Plaintiff, is valid consideration to support the NOL Carryback Arrangement.[98]

Defendants' second argument, that the Merger Agreement's prohibition on oral modification bars Plaintiff's claim, is a bit harder to resolve. Plaintiff acknowledges the Merger Agreement does not allow for oral modification.[99] Section 12.11 provides:

---

[98] *See, e.g.*, *Rsch. & Trading Corp. v. Powell*, 468 A.2d 1301, 1305 (Del. Ch. 1983) (holding employer's forbearance from exercising its right to terminate an at-will employee is valid consideration); *see also Se. Chester Cty. Refuse Auth. v. BFI Waste Servs. of Pennsylvania, LLC*, 2015 WL 3528260, at *3 (Del. Super. June 1, 2015) (noting "a promise to forbear enforcement and to dismiss a lawsuit is valid consideration for an agreement" (internal quotation marks omitted) (quoting *Hensel v. U.S. Elecs. Corp.*, 262 A.2d 648, 650 (Del. 1970)). To be clear, there was no promise not to sue alleged here; Plaintiff's promise to not press its rights under Section 8.08(a)(ii) is itself sufficient consideration without such a promise.

[99] *See* Am Compl. ¶ 93 n.10.

Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Parent, Buyer, Merger Sub and the Stockholders' Representative; provided that the proviso to Section 12.02, this proviso to Section 12.11 and Section 12.18 may not be amended in a manner adverse to the interests of any Debt Financing Source without the prior written consent of such Debt Financing Sources that are commitment parties under any commitment letter or any definitive financing agreement to provide Debt Financing. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty, covenant or agreement hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. In furtherance of the cooperation covenant set forth in Section 7.05, the consent of the Parties to any amendment to Section 12.02 (No Third Party Beneficiaries); Section 12.11 (Amendments and Waivers) and Section 12.18 (Lender Matters) to incorporate customary comments of any Debt Financing Source that is a commitment party under any commitment letter to provide Debt Financing shall not be unreasonably withheld, conditioned or delayed.[100]

Plaintiff does not argue the NOL Carryback Arrangement was ever reduced to writing.[101] In a footnote in the Amended Complaint, Plaintiff nevertheless suggests it should be allowed to avoid this clear prohibition because Defendants waived Section 12.11.[102] While Plaintiff will carry a heavy burden to prove this theory, I cannot foreclose it at this early stage.

---

[100] Merger Agr. § 12.11.

[101] *See* Am Compl. ¶ 93 n.10.

[102] *See id.*

Delaware courts recognize that "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision."[103]  Establishing waiver of such a provision thus requires the same elements described above:  "(1) that there is a requirement or condition to be waived, (2) that the waiving party must know of the requirement or condition, and (3) that the waiving party must intend to waive that requirement or condition."[104]  Though permissible, "oral waivers of written contracts are not favored for a host of pragmatic and public policy reasons."[105]  "There must be a clear intention to alter the express terms."[106]  An oral waiver thus "must be of such specificity and directness that there is no doubt regarding the parties' intention to change the formally solemnized written contract."[107]

---

[103] *Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at \*52 (Del. Ch. Aug. 13, 2021) (internal quotation marks omitted) (quoting *Cont'l Ins.*, 750 A.2d at 1229); *accord Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) ("The prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by [t]he course of conduct of the parties.").

[104] *Bantum*, 21 A.3d at 51 (Del. 2011) (internal quotation marks omitted) (quoting *AeroGlobal*, 871 A.2d at 444).

[105] *Symbiont.io*, 2021 WL 3575709, at \*52 (internal quotation marks omitted) (quoting *Tunney v. Hilliard*, 2008 WL 3975620, at \*5 (Del. Ch. Aug. 20, 2008), *aff'd*, 970 A.2d 257 (Del. 2009)).

[106] *Simon Prop. Gp., L.P. v. Brighton Collectibles, LLC*, 2021 WL 6058522, at \*3 (Del. Super. Dec. 21, 2021).

[107] *Symbiont.io*, 2021 WL 3575709, at \*52 (internal quotation marks omitted) (quoting *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 2007 WL 4054231, at \*8 (Del. Ch. Nov. 9, 2007), *aff'd*, 961 A.2d 521 (Del. 2008)); *see also Simon Prop.*, 2021 WL 6058522

That said, waiver is a fact-intensive inquiry and Delaware courts have been reluctant to decide waiver on the pleadings. At the pleading stage, where this Court must read the facts in the light most favorable to the plaintiff and make all reasonable inferences in its favor, the Superior Court has twice declined to dismiss claims that a no-oral-modification clause was orally waived as part of an oral modification. In *Good v. Moyer*[108] and *Simon Property Group, L.P. v. Brighton Collectibles, LLC*,[109] the plaintiff alleged an oral modification to a written contract in the face of a provision prohibiting oral modifications, and argued the defendant waived the protections of that provision by silence and conduct inconsistent with that requirement.[110] Both cases concluded that where an oral modification was pled, it was reasonably conceivable that the parties also waived the no-oral-modification provision.[111]

The NOL Carryback Arrangement fits that mold. Plaintiff sufficiently alleges that Buyer, through Berger, and Sellers, through Sarafa at Century Park, orally agreed that if Plaintiff promised to forgo its right to comment on the Buyer Prepared

at *3 (discussing the "specificity and directness" requirement in evaluating a motion to dismiss).

[108] 2012 WL 4857367 (Del. Super. Oct. 10, 2012).

[109] 2021 WL 6058522.

[110] *Good*, 2012 WL 4857367, at *5–6; *Simon Prop.*, 2021 WL 6058522, at *3–4.

[111] *Good*, 2012 WL 4857367, at *5–6; *Simon Prop.*, 2021 WL 6058522, at *3–4.

Returns and let Buyer carry the NOLs back, Buyer would remit the benefit to Plaintiff once the Company received the refunds.[112]   At this early stage, it is reasonably conceivable that Buyer also waived Section 12.11.   The strenuous evidentiary standard for an oral waiver of a no-oral-modification provision awaits Plaintiff after discovery.[113]

The Motion is denied as to Count III.

### C.   Counts II And IV Fail To State Claims For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

The Amended Complaint asserts two implied covenant theories, one in Count II and the other in Count IV.   I conclude neither states a claim because Plaintiff has not identified a gap in the Merger Agreement that requires implied contract terms to fill it.

---

[112] *See* Am. Compl. ¶¶ 37–42, 48–49, 93.

[113] As then-Vice Chancellor Strine wrote:

> The law has long struggled with the question of whether a contractual provision requiring written modifications or waivers can itself be modified by the oral statements or conduct of a party. . . . [O]ur law has embraced a handy tool of the common law jurist: the ability to increase the level of proof the plaintiff must submit in order to prevail.  Arguably, our law has done that in this area by upping that level of proof from a mere preponderance to clear and convincing evidence, a move that also has been made in situations when a party seeks to prove the existence of a partially performed oral contract in derogation of the statute of frauds.

*Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 109–10 (Del. Ch. June 6, 2006) (footnotes omitted).

"The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[114] "To state a claim for breach of the implied covenant, [Plaintiff] must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to [Plaintiff]."[115]

"[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare,"[116] especially "when the contract easily could have been drafted to expressly provide for it."[117] "It must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the

---

[114] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (internal quotation marks omitted) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

[115] *Wiggs v. Summit Midstream P'rs, LLC*, 2013 WL 1286180, at *9 (Del. Ch. Mar. 28, 2013) (internal quotation marks omitted) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[116] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006) (quoting *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005)).

[117] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (quoting *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006)).

act later complained of had they thought to negotiate with respect to that matter."[118] The implied covenant "cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents."[119]

Thus, an essential predicate for the application of the implied covenant is the existence of a "gap" in the relevant agreement.[120] "The implied covenant provides a limited gap-filling tool that allows a court to impose contractual terms to which the parties would have agreed had they anticipated a situation they failed to [address]."[121] Determining whether the implied covenant applies turns on the language of the contract itself.[122] A claim for breach of the implied covenant cannot be based "on conduct authorized by the terms of the agreement."[123] The Court relies on the implied covenant "only in that narrow band of cases where the contract as a

---

[118] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (alterations omitted) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

[119] *Dunlap*, 878 A.2d 434, 441 (Del. 2005) (alterations, footnote, and internal quotation marks omitted) (compiling sources and quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

[120] *See Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *4 (Del. Ch. Jan. 30, 2015).

[121] *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *10 (Del. Ch. Jan. 18, 2013).

[122] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (ORDER).

[123] *Dunlap*, 878 A.2d at 441; *see also Allen*, 113 A.3d at 183 (stating the covenant cannot be used to "contradict[] a clear exercise of an express contractual right" (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010))).

whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."[124]

### 1. Count II Fails To State A Claim.

In Count II, Plaintiff alleges Buyer had an "implied contractual obligation under the Merger Agreement to act in good faith and to not act so as to deprive Plaintiff . . . of the benefits thereto."[125] Plaintiff asserts that the Merger Agreement makes plain that Buyer had an obligation "not to take for themselves the economic benefits of the transaction tax benefits, which the Merger Agreement specified were for the account of Plaintiff (and the Stockholders and Optionholders) and not to engage in conduct that would directly or indirectly violate that directive."[126] Specifically, Plaintiff asserts "[t]he parties did not foresee a post-Closing tax law change that permitted NOL carrybacks to prior years, given existing tax law at the time of contracting only permitted NOLs to be carried forward to future years."[127] It argues that this unexpected change created a gap in the Merger Agreement, which "did not address NOL carrybacks."[128]

---

[124] *Lonergan*, 5 A.3d at 1018 (quoting *Airborne Health,* 984 A.2d at 146).

[125] Am. Compl. ¶ 79.

[126] *Id.*

[127] AB 35 (citing Am. Compl. ¶ 74).

[128] *Id.* 36.

It is true that the Merger Agreement provides that transaction tax benefits should go to the Sellers. It is true that the Merger Agreement does not specifically address NOL carrybacks and carryforwards. It is true that Section 8.08(j) only remits tax refunds from the 2019 Tax Period and the 2020 Stub Period to Plaintiff. And it is true that the CARES Act's result of NOL carrybacks for transaction deductions, generating refunds from previous years, was not contemplated when the Merger Agreement was negotiated and executed. But Section 8.08(a)(ii) simply does not permit Buyer to carry NOLs back at all in the Buyer Prepared Returns, as doing so was inconsistent with the Company's pre-Merger practices. As explained, Section 8.08(a)(ii) compels consistency in tax treatment even in the wake of changes in methods or opportunities; a change in opportunities does not create a gap because the provision tells the parties to stay the course. CARES Act carrybacks do not create a gap because Section 8.08(a)(ii) tells Buyer how to respond.

And if Plaintiff prevails on its claim that the Merger Agreement was modified to permit NOL carrybacks, then those contractual terms will govern and the benefits will flow to Plaintiff accordingly. There will be no gap for the implied covenant to fill.

The Motion is granted with respect to Count II.

## 2. Count IV Fails To State A Claim.

In Count IV, Plaintiff alleges Buyer had an implied obligation to prepare the Buyer Prepared Returns "on a basis consistent with the tax law existing as of the parties' entry into the Merger Agreement."[129] Once again, Plaintiff claims Buyer breached this obligation by carrying NOLs back instead of forward.[130] Plaintiff appears to present this claim in the alternative to its breach theory in Count III.[131] But as I have explained, Section 8.08(a)(ii) explicitly addresses Buyer's obligations regarding preparing the Buyer Prepared Returns, and requires Buyer to prepare the Buyer Prepared Returns just as the Company had prepared its pre-closing returns. The Merger Agreement therefore does not have a gap capable of being filled by the implied covenant on this subject.[132]

Count IV goes on to claim that Buyer breached an implied obligation "to not materially mislead Plaintiff in connection with its review and comment on the Buyer Prepared Returns."[133] Defendants counter that this simply repackages Plaintiff's

---

[129] Am. Compl. ¶ 101.

[130] *See id.* ¶¶ 103–05; *see also* AB 37–38.

[131] AB 37 (arguing Buyer's implied obligation exist "to the extent not already required by the express terms of the Merger Agreement").

[132] To the extent Plaintiff would have me imply a term into the Merger Agreement requiring compliance with prior tax law, that possibility is displaced by the contract language. As I have explained, Section 8.08(a)(ii) fully addresses the interplay between compliance with the tax code and Buyer's post-Merger obligations preparing the Buyer Prepared Returns.

[133] Am. Compl. ¶ 102.

fraud claim.[134] It is true that "[t]he implied covenant generally prohibits a party from providing false information to its contractual counterparty."[135] But even assuming the implied covenant operated in the Merger Agreement as Plaintiff alleges, Plaintiff has not alleged Buyer made any false statements that would have breached such a term. As explained in more detail in my discussion of Plaintiff's fraud claim, Plaintiff conspicuously stops short of alleging any of Buyer's or its affiliates' statements were false when made. Lacking any allegation that Buyer lied to Plaintiff, Plaintiff cannot state a claim for a breach of an implied obligation not to lie.[136]

The Motion is granted with respect to Count IV.

---

[134] *See* OB 37; RB 21.

[135] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *23 (Del. Ch. June 12, 2014); *see also id.* ("Even when agreeing to a contractual relationship that either party could terminate at will, parties generally would not grant each other the right to commit fraud. It would be a rare party who, in the original bargaining position, would agree that their counterparty could defraud him. Absent explicit anti-reliance language pursuant to which a sophisticated party knowingly assumes risk, a court can presume that the question 'Can I lie to you?' would have been met with a resounding 'No.' Proof of fraud therefore violates the implied covenant, not because breach of the implied covenant requires fraud, but because 'no fraud' is an implied contractual term." (alterations omitted) (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 443 (Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013))).

[136] *See id.* (granting summary judgment dismissing a claim for breach of an implied obligation not to "misrepresent facts" where the plaintiffs failed to "submit[] evidence from which a fact-finder could infer that [defendants] provided false information").

### D. Count V Fails To State A Claim For Fraud.

Count V asserts a claim for fraud, alleging Berger's promises to remit the tax returns derived from NOL carrybacks to Sellers in exchange for Sellers' agreement not to comment on the Buyer Prepared Returns wrongfully induced Plaintiff's silence.[137] Defendants' Motion points out a fundamental problem: Plaintiff's failure to allege that Defendants made an actionable false statement.

> To survive a motion to dismiss on a claim for fraud, a plaintiff must plead:
>
> 1) a false representation, usually one of fact; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[138]

Court of Chancery Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[139]

---

[137] *See* Am. Compl. ¶¶ 113–14.

[138] *Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586 (Del. 2008) (alterations omitted) (quoting *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)); *see also Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[139] Ct. Ch. R. 9(b).

To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations. Essentially, the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim.[140]

This heightened standard for the circumstances of an alleged fraud is distinct from state of mind and knowledge, which plaintiffs usually may aver generally.[141]

Plaintiff's fraud allegations are not based on false representations of fact; rather, Plaintiff relies on Defendants' and their affiliates' promises that Plaintiff would be paid the benefit of tax refunds from the NOL carrybacks.[142] Plaintiff's allegations are thus best considered through the lens of "promissory fraud." "This Court looks with particular disfavor at allegations of fraud when the underlying utterances take the form of unfulfilled promises of future performance."[143] Thus when a fraud claim hinges on promissory statements, or expressions as to what will happen in the future, a plaintiff faces a heightened burden to plead "particularized

---

[140] *Abry P'rs*, 891 A.2d at 1050 (footnotes omitted) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

[141] *See* Ct. Ch. R. 9(b).

[142] *See* Am. Compl. ¶¶ 113–15. To the extent Plaintiff casts statements like "Lakeview agreed to the NOL carryback arrangement whereby Defendants would pay over the resulting Tax Refunds to Plaintiff" as statements of fact, Plaintiff does not plead that this statement is false or even that the arrangement fell through because Lakeview did not approve the deal. *See* Am. Compl. ¶ 42; *see also* AB 45.

[143] *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *9 (Del. Ch. Dec. 23, 2008).

facts that allow the Court to infer that, at the time the promise was made, the speaker had no intention of keeping it."[144] In *Grunstein v. Silva*, this Court explained:

> [B]ecause the factual predicate of a promissory fraud claim is the speaker's state of mind at the time the statement is made, a general averment of a culpable state of mind is insufficient. Instead, the plaintiff "must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made."[145]

"This is, in part, because of the general rule that 'statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud.'"[146] "To anticipate the future and predicate falsehood upon an act to be done or omitted at a future day would change a mere broken promise into a fraud on the part of him who was bound to fulfill the engagement[.]"[147] "[A]

---

[144] *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010); *see Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) (stating plaintiff must allege particularized facts that infer "the speaker had no intention of performing"); *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *4 (Del. Super. Apr. 12, 2001) ("Only when such statements are made with the present intention not to perform will courts endorse a fraud claim."); *see also Winner*, 2008 WL 5352063, at *10 ("[T]o state a claim for promissory fraud, a plaintiff must plead something more than a promise, mere nonperformance, justifiable reliance, damages, and a general averment of a culpable state of mind. To assert a claim for promissory fraud, the plaintiff also must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made." (footnote omitted) (citing *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, 1997 WL 793088, at *8–9 (Del. Ch. Dec. 15, 1997))).

[145] *Grunstein*, 2009 WL 4698541, at *13 (quoting *Winner*, 2008 WL 5352063, at *10).

[146] *Id.* (citing *Outdoor Techs.*, 2001 WL 541472, at *4).

[147] *Id.* (citation omitted).

party's failure to keep a promise does not prove the promise was false when made."[148]

Despite repeatedly alleging Defendants or their affiliates made statements promising to remit the tax returns derived from NOL carrybacks to Sellers, Plaintiff does not ever allege these promises were false. In fact, Plaintiff conspicuously tiptoes around such an allegation. For example, Plaintiff alleges:

> Berger stated that Lakeview would most likely agree to an NOL carryback arrangement whereby if Sellers agreed to go along with the Company carrying back the transaction deductions over five years and refrain from exercising their right under the Merger Agreement to comment on the Buyer Prepared Returns to require the Company to carry the transaction deductions forward, Buyer would pay over the Tax Refunds derived from those loss carrybacks to Sellers.[149]

In the next paragraph, Plaintiff alleges Berger told Sarafa that Defendants' accountants "also agree that the benefit goes back to the seller."[150] Plaintiff similarly alleges Lakeview, Buyer's affiliate, agreed to the NOL Carryback Arrangement.[151] The Amended Complaint summarizes several of these statements in a single paragraph[152] and then alleges:

---

[148] *Id.* (quoting *Berdel*, 1997 WL 793088, at *8).

[149] Am. Compl. ¶ 37.

[150] *Id.* ¶ 38.

[151] *Id.* ¶ 42.

[152] *Id.* ¶ 6.

Had Plaintiff not been deceived by Defendants based on Defendants' representations and agreement to the carryback arrangement, Plaintiff would have provided reasonable comments to Defendants regarding Defendants' tax returns such that the NOLs would have been carried *forward* and thus indisputably subject to the transaction tax benefit provision of the Merger Agreement.[153]

But Plaintiff stops short of alleging these representations were false or the promises insincere. In fact, Plaintiff repeatedly alleges the parties affirmatively agreed to the NOL Carryback Arrangement—not just that Defendants stated their agreement attempting to deceive Plaintiff.[154] Without an allegation that Defendants' (or their affiliates') promises were knowingly false when made, Plaintiff cannot sustain a fraud claim.

Faced with this pleading deficiency, Plaintiff falls back on its argument that the fact Defendants ultimately broke their alleged promises ought to support a reasonable inference that they never intended to follow through.[155] But again, "a party's failure to keep a promise does not prove the promise was false when made."[156] Without particularized facts to support that inference, Plaintiff cannot state a fraud claim.[157]

---

[153] *Id.* ¶ 8.

[154] *E.g.*, *id.* ¶¶ 5, 6, 44, 93, 112.

[155] *See* AB 45–46.

[156] *Grunstein*, 2009 WL 4698541, at *13 (quoting *Berdel*, 1997 WL 793088, at *8).

[157] *See MicroStrategy*, 2010 WL 5550455, at *15; *Grunstein*, 2009 WL 4698541, at *13; *Outdoor Techs.*, 2001 WL 541472, at *4; *Winner*, 2008 WL 5352063, at *10.

This fate for Plaintiff's fraud claim does not mean Defendants' broken promise is beyond Plaintiff's reach. I have accepted Plaintiff's allegation that Defendants sincerely promised to remit the tax returns. This allegation forms the basis of an oral contract, the NOL Carryback Arrangement, a claim for breach of which survives the Motion in Count III. And, as explained below, an alternative claim for unjust enrichment based on the same facts also survives the Motion in Count VI. But lacking particularized allegations asserting or supporting a reasonable inference that "at the time the promise was made, the speaker had no intention of keeping it,"[158] Plaintiff cannot pursue a fraud claim.

The Motion is granted with respect to Count V.

### E. Count VI States A Claim For Unjust Enrichment.

Count VI alleges Defendants were wrongfully enriched when they retained the tax refunds to Plaintiff's detriment.[159] Plaintiff's unjust enrichment claim presents a similar theory to its breach of contract claims in Counts I and III. On that basis, Defendants argue Count VI should be dismissed because the parties' contracts comprehensively govern Plaintiff's claim.[160] Plaintiff argues it should be permitted

---

[158] *MicroStrategy*, 2010 WL 5550455, at *15.

[159] *See* Am. Compl. ¶¶ 118–22.

[160] OB 47–48; RB 28–30.

to maintain its unjust enrichment claim in the alternative because Defendant is pressing the position that the parties' oral agreement is unenforceable.[161]

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[162]  It is "a theory of recovery to remedy the absence of a formal contract."[163]  Under Delaware law, the elements of unjust enrichment are (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[164]

Defendants' Motion is premised on an important threshold question: "whether a contract already governs the relevant relationship between the parties."[165] If the parties' relationship is comprehensively governed by contract, a claim for unjust enrichment will be dismissed because the "contract is the measure of

---

[161] AB 56.

[162] *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015) (internal quotation marks omitted) (quoting *Kuroda,* 971 A.2d at 891–92).

[163] *Choupak v. Rivkin,* 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015) (internal quotation marks omitted) (quoting *ID Biomedical Corp. v. TM Techs., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)).

[164] *Nemec*, 991 A.2d at 1130.

[165] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009) (citing *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006)); *accord Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE).

plaintiffs' right."[166] But "[i]f the validity of that agreement is challenged . . . claims of unjust enrichment may survive a motion to dismiss."[167] Defendants question the validity of one of the contracts on which Plaintiff bases its claims, namely, the alleged oral NOL Carryback Arrangement. Because this decision cannot resolve the gating issue of whether Plaintiff can show a valid oral contract, Plaintiff's unjust enrichment claim survives in the alternative.

The Motion is denied as to Count VI.

### F. The Motion Does Not Assert A Basis To Dismiss Count VII's Indemnification Claim.

Count VII seeks indemnification under Section 11.03(a) of the Merger Agreement.[168] Under that provision, Buyer must indemnify Plaintiff for, among other things,

---

[166] *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del. 1979); *accord Kuroda,* 971 A.2d at 891.

[167] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014) (citing *Bakerman*, 2006 WL 3927242, at *18); *see Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *14 (Del. Ch. Jan. 31, 2013) ("As is typical, [Plaintiff] has pleaded this claim in the alternative. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls. Where, as here, doubt exists surrounding the existence of a contract, the Court will allow [Plaintiff] to seek recovery under this theory provided the requisite elements are adequately pleaded." (footnote omitted) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005))).

[168] Am. Compl. ¶¶ 123–30.

From and after the Closing, Buyer and Merger Sub shall jointly and severally indemnify and hold harmless the Stockholders and Optionholders and their respective Representatives (each, a "Stockholder Indemnified Party") against and in respect of any and all Damages resulting from (i) the breach by Buyer or Merger Sub of any representation or warranty made by Buyer or Merger Sub in ARTICLE V (Representations and Warranties of Buyer and Merger Sub) (in each case as such representation, warranty or statement would read had any references to "material," "materiality," or any similar materiality qualifications been deleted therefrom), (ii) the breach by Buyer or Merger Sub of any covenant or agreement to be performed by it hereunder, (iii) the breach by the Company of any covenant or agreement to be performed by it after the Closing hereunder and (iv) any Fraud by Buyer or Merger Sub relating to the Transactions. All Damages payable by Buyer and Merger Sub to the Stockholders and Optionholders pursuant to this Section 11.03(a) shall be paid to the Stockholders' Representative on behalf of each such Stockholder and to the Surviving Company for further distribution to each Optionholder in accordance with such Person's Indemnity Percentage Allocation. All Damages under this Section 11.03(a) shall be determined without regard to any qualifications in any such representation or warranty referencing the terms "materiality" or other terms of similar import or effect.[169]

The only basis the Motion asserts to dismiss Count VII is that the Amended Complaint fails to state a predicate claim.[170] Because I conclude Counts I, III, and VI state viable predicate claims, Defendants' argument is without merit.[171]

The Motion is denied with respect to Count VII.

---

[169] Merger Agr. § 11.03(a).

[170] OB 48; RB 30.

[171] *E.g.*, *IAC Search, LLC v. Conversant LLC*, 2016 WL 6995363, at *12 (Del. Ch. Nov. 30, 2016) (denying motion to dismiss contractual indemnification claim where motion to dismiss predicate claims was denied).

### III. CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** in part and **DENIED** in part. The Motion is granted with respect to Counts II, IV, and V. The Motion is denied with respect to Counts I, III, VI, and VII.